# Exhibit S

Denial Letter Dated February 27, 2025

*Confidential



## CONFIDENTIAL

**DATE:**     February 27, 2025

**TO:**       Johnny Gaskin and Attorney Wayman Prince

**FROM:**     Office of Equal Opportunity Services

**SUBJECT:**  Report of Preliminary Investigation re: Johnny Gaskin

---

### AUTHORITY

This report is authorized in accordance with the University of Houston System ("UHS") Administrative Memorandum Number 01.D.07, "Anti-Discrimination Policy." The Office of Equal Opportunity Services ("EOS") has completed its investigation of a complaint filed on May 16, 2022, by Johnny Gaskin, (former Security Officer) against various UH employees in the University of Houston Police Department and Human Resources office.

### SCOPE OF THE INVESTIGATION

On February 22, 2022, an attorney for Mr. Gaskin ("Complainant") dated a letter to the UH President with concerns for the Complainant's alleged forced resignation. The letter included Complainant concerns such as poor communication within the department, the power level of lead security officers, elder abuse, abusive power by "Females in charge" and other general concerns (such as overwork, high turnover and poor training). EOS attempted to reach the Complainant by phone and email on March 14 to discuss his concerns. On March 23, the Complainant's attorney replied that they intended to submit a formal complaint in the form of a letter with "typical EEOC charges." EOS replied the same day to remind the Complainant of the filing deadline. EOS continued to provide additional policy information to the Complainant including another notice on May 4 of the filing deadline for any Anti-Discrimination complaint within 180 days. On May 16, the Complainant submitted an online report of his concerns (not the formal complaint document

*Confidential

previously provided by EOS). EOS facilitated a meeting with the Complainant and his attorney on May 27 and reiterated the filing deadline to collect complaint details. The Complainant indicated that he wished his online report to serve as his formal complaint, and that his termination in December 2021 was part of a pattern of discrimination. EOS facilitated an option for the Complainant to supplement his online report with more information to support his complaint. EOS investigated his complaint that various Respondents violated the UH Anti-Discrimination Policy on various occasions between March 2017 and December 2021. Calculating the filing date most in favor of the Complainant, the timely range of activities to consider for possible violations is November 17, 2021 or later. Activities prior to that date are considered by EOS only to the extent to serve as possible evidence of discrimination for other timely claims.

In order to process his complaint narrative as requested, EOS noted additional information would be required (as provided to him in writing) including a full list of the intended Respondents, a description of his desired resolution, and any evidence he would like EOS to consider as part of the complaint. The Complainant continued to provide more information to supplement his original claims over time, though some Respondents remained identified only by a title, first and/or last name. The Complainant concluded a series of supplements in November 2023.

Mr. Gaskin (the "Complainant") alleges that various employees (the "Respondents") discriminated against him on the basis of race and/or color, sex and/or gender, and/or age. The Respondents ranged in roles of supervisors, officers with higher rank, coworkers and HR personnel with listed activities from May 2017 through his resignation in December 2021. Due to the number of allegations and Respondents, the particular incidents are outlined in Appendix A. The allegations are described herein according to the respective Respondent's job title at the timeframe of the listed item. Generally, the allegations are grouped into categories related to the Complainant's fire watch duties, overtime hours, medical leave, general treatment on the job, HR and promotion claims as well as termination-related concerns.

## COMPLAINANT EMPLOYMENT HISTORY

EOS reviewed 123 pages of Complainant personnel records from Human Resources in addition to pay records. The Complainant's original job application included the question, "Are you available to work a flexible work schedule as needed to ensure adequate staffing at all times?" to which the Complainant marked "Yes." Assistant Chief C.J. was the signatory to the offer letter for the Complainant. Performance evaluations from 2016-2020 indicated that he achieved expectations including evaluations by Lead Officers J.P. (2016) and C.K. (2017-2020).

A letter from Human Resources dated April 21, 2021, stated that the Complainant began medical leave on February 23, 2021, with twelve weeks of Family Medical Leave (FML) status concluding on May 18, 2021. The same letter noted that his doctor's certification would not end until August 23, 2021, and continued medical leave through that timeframe would be discretionary for the department. Per a letter from Human Resources dated May 11, 2021, effective on March 25, 2021

*Confidential

the Complainant met eligibility requirements for sick pool and received additional 240 hours of paid sick time from March 26, 2021 through May 6, 2021. Per another letter dated June 17, 2021, he then received additional 240 hours of paid sick time from May 9, 2021 through June 20, 2021. Per a final letter from Human Resources dated June 22, 2021, he also received additional 240 hours of paid sick time from June 21, 2021 through August 2, 2021. Therefore the department did not prevent the Complainant from collecting 720 additional hours of paid leave during and after he exhausted FML status.

Per internal emails, University Business Services notified Assistant Chief C.J. that as of December 16, 2021, the Complainant remained on unpaid leave status and his medical documentation indicated he was incapacitated until February 23, 2022. Business Services explained that, per policy, it was discretionary for the department to approve additional unpaid leave. Assistant Chief C.J. replied that the Complainant submitted his resignation letter the previous day, and that the Complainant listed an effective resignation date on the letter in order to provide two weeks notice. EOS reviewed the resignation letter dated December 16, 2021, citing "ongoing medical issues" as the reason for his resignation effective December 28, 2021.

## SUMMARY OF EOS REVIEW

EOS considered the following claims under the UH System Anti-Discrimination Policy, which defines discrimination as "treating an individual or members of a Protected Class less favorably because of their membership in that class, or having a policy or practice that has a disproportionately adverse impact on Protected Class members."

Claim Related to Fire Watch Duties

The Complainant alleges that Sergeant J.C.,[1] "J.P."[2] and Lead Officer C.K.[3] **did not relay information** to the Complainant for his job duties in the fire watch program based on his age and race from May 2017 to February 2021.

- EOS considered this claim separately as the first temporal item in the list. EOS notes that even considering the Complainant's filing timeline at the earliest available date of May 16, 2022, the relevant timespan for complaint timeliness is no earlier than November 17, 2021. The complaint does not specify what fire watch information was not provided, nor give

---

[1] Police Sergeant J.C. completed his work at UH in December 2021, prior to the complaint filing date.

[2] Human Resources personnel records did not include a person by the full name J.P. listed in the complaint. It is unclear from complaint records if this individual is a female Lead Security Officer by same first name and different last name, who served as a Lead Security Officer until December 2021 and completed the Complainant's evaluation for 2016. During the employment of Complainant, there was also a Lead Security Officer E.P.G. (similar middle/surname spelling), but neither his first name nor second surname are mentioned in the complaint materials. Therefore EOS references to various complaint claims attributed to female first name J.P. or P-last name only claims as female then-Lead Officer J.P.

[3] EOS notes that C.K. was Lead Security Officer until his demotion in June 2022 to Security Officer.

*Confidential

comparator information for other(s) who received such information in order to perform their duties. The complaint also does not specify what negative employment action happened to the Complainant as a result (all of his performance evaluations were satisfactory). The allegation therefore is untimely, does not provide sufficient details or facts for a finding to be made under the Policy, and the complaint does not provide facts which link the alleged conduct to a Protected Class category.

Claims Related to Overtime

The Complainant alleges there was an unspecified report related to Lead Officer J.P., after which Sergeant J.C. changed the overtime system between August 2017 and December 2021. The complaint alleges that Lead Officer J.P. informed the Complainant that he was being too greedy with overtime, and that this communication took place sometime from February 2018 to December 2021 based on his race, age and sex. During that timeframe, the complaint alleges that Lead Officer J.P. would schedule shifts so that women had the weekends off, as well as gave a female officer more overtime while reducing the Complainant's overtime.

- While the complaint lists Sergeant J.C.'s action as retaliation and discriminatory based on race, sex and age, the complaint does not specify what protected activity under the Policy the Complainant previously engaged in. The complaint also does not specify what change Sergeant J.C. made to the system, or how the change targeted and/or negatively impacted the Complainant. To the extent the Complainant did not report to work in late 2021, the claim is also untimely. Therefore the claim against Sergeant J.C. is untimely, does not provide sufficient details or facts for a finding to be made under the Policy, and does not provide facts which link the alleged conduct to a Protected Class or protected activity.

- As to Lead Officer J.P. and other unnamed lead officers, the complaint does not provide the names of the female officers for comparison, and the records reviewed by EOS support that the Complainant worked more than the average amount of overtime for security officers generally and that males and females averaged approximately equal amounts of overtime per week. EOS requested time compensation records from Human Resources payroll services and received comprehensive timesheet records of 127 employees in Security Officer roles as comparators. EOS then analyzed the records to calculate the number of weeks each person worked overtime during the date range (as hire/termination dates varied across the group) and used that information to calculate average number of overtime hours per week. The Complainant averaged 7.45 hours per week of overtime during the reviewed timespan (with the first entry 1/9/2018 and last entry 2/2/2021). As to gender, the maximum values for average hours per week across the dataset were 15.9 hours per week for male security officers and 12.3 hours per week for female security officers. Notably, the average per week for all male security officers was 2.8 hours, and female security officers was 2.7 hours. Therefore while the Complainant exceeded the average hours, he worked well below both some male and female officers' amount of overtime.

*Confidential

> EOS notes that per UHPD, officers also had the opportunity to volunteer for overtime based on the UHPD special event scheduling calendar.

- As to race, the dataset showed that the average hours per week was 1.9 hours per week (white security officers), 2.9 hours (black security officers) and 3.1 hours (Hispanic security officers). Therefore the difference in average hours worked per week was marginal at only 1.2 hours variation across all three groups. The maximum hours worked per week on average were 7.7 hours (white security officers), 15.9 hours (black security officers) and 11.2 hours (Hispanic security officers). Again, the Complainant worked an average of 7.45 hours, less than all three groups' maximums as averaged. As to age, employees in the group age of 40 and older (calculated from the last date of each employee's overtime entries) averaged 2.6 hours of overtime per week. Employees under the age of 40 worked an average of 3.0 overtime hours per week. The maximums for the averaged groups were 15.9 hours (under 40 years old) and 11.2 hours (40 years and older). Therefore while the Complainant exceeded the overtime averages for both groups, he worked significantly below the maximum levels for each group.

- Based on the above data, the allegation is untimely as Complainant did not report to work at the end of 2021, does not provide sufficient details or facts for a finding to be made under the Policy, and does not provide facts which link the alleged conduct to a Protected Class category.

The complaint also alleges Assistant Chief C.J., Sergeant J.C. and Lead Officer C.K. still scheduled the Complainant for **double shifts for overtime on Fridays and Saturdays** after a change to the scheduling system from May 2018 to February [2021].[4]

- The complaint does not specify that the Complainant sought to decline overtime, or give comparator information for other(s) who received different scheduling preferences. EOS analyzed the Complainant's time clock records from 1/1/2018 through his last date worked not recorded as leave, 2/22/2021. While the entirety of the claim is untimely, the allegation was considered as to whether it could lend weight to other allegations of discrimination. The dataset represents 164 weeks of logged working hours. In that time frame, the Complainant worked a regular 5-day schedule from Sunday to Thursday based on the records (i.e. Friday and Saturday served as his "weekend"). He clocked work time on eleven Fridays (including one Friday before May 2018) and thirteen Saturdays. Four of these instances occurred on the same weekend. Therefore, he worked extra shifts on sixteen weeks or approximately ten percent of the weeks in the time range. Given the importance of security officer presence to a large University campus within an urban area, as well as the higher overtime rates worked in the department, only 10 percent of workweeks with

---

[4] The Complainant's records indicate the scheduling extended through 2023, however the Complainant's job was terminated in December 2021 after medical leave starting in February 2021.

*Confidential

"weekend" overtime does not present an inordinate call-in history. The allegation does not provide sufficient details or facts for a finding to be made under the Policy, does not provide facts which link the alleged conduct to a Protected Class category and is untimely.

<u>Claims Related to Leave</u>

The complaint alleges discrimination based on sex, race and age based on Sergeant B. (no employee match),[5] Lead Officer Z.S.[6] and Lead Officer L.P. sending the Complainant **home for four days without a reason** and without calling for paramedics during January 2021 to February 2021 timeframe based on his sex, race and age.[7] The complaint alleges that Lead Officer D.[8] told Lead Officer Z.S. to call for paramedics after observing the Complainant, but UHPD did not call for medical aid. The complaint also alleges that Lead Officer Z.S. told the Complainant that Lead Officer L.P. expected the Complainant to update the department as soon as the Complainant left his doctor's appointment, thereby harassing the Complainant for not calling in with an update on his status when he was actually in the hospital. According to the complaint, Lead Officer C.K. sent a message to the Complainant while he was on medical-related leave that "if you wanted more time off you should have just asked instead of taking these measures," and **encouraged him to resign.** The Complaint provides the timeframe for Lead Officer C.K.'s conduct as February 2018 to December 2021.

- The complainant included a photo of a text message screen dated February 22, 2021, from Lead Officer Z.S. stating "FYI I understand you're out due maybe to medical reason but you [won't] have enough time to cover[;] you only had 16 hrs." Another message followed on February 24, 2021, "Take care of yourself but just heads up you already have 1 icn (sic) pending you're low on hours again take care." Then a message followed stating, "Checking to see how u was doing." The next message states, "Just checkin[;] [Lead Officer L.P.] ask did u call back because u said u would give a health update when [you] left that doctor." The dating on the message is not clearly discernable and may be February 25 or 28, 2021. The complaint also included a photograph of a text message dated before March 1, 2021 (exact date not indicated) signed by text as Lead Officer C.K. (no message phone number or specific timestamp) that, "You need to stop. I know you just want more vacation time and going thru this. To get time off. Still get well soon as possible we need you back here."

---

[5] As noted, EOS did not locate personnel records for a Sergeant in UHPD by first or last name provided after checking more than 200 record results. EOS located records of two security officers with that last name: one at UHD and the other hired at UH in 2023.

[6] Lead Officer Z.S. concluded employment at UH in November 2023, after promotion to Police Officer.

[7] The complaint materials also mentioned another employee B.#2 (rank and full name unspecified). EOS could not identify the person from personnel records.

[8] EOS did not locate further identification for this person (listed only as partial name in complaint materials).

*Confidential

- The Complainant's personnel record reflects that the Complainant received Family Medical Leave status on February 23, 24, 25 and 28, 2021. The complaint appears to argue both that the Complainant experienced a medical event serious enough that an ambulance should have been called, and that there was not a reason for him not to work (alleging the department sent him home for no reason). The Complainant submitted and received approval for FML and sick pool leave thereafter. Therefore the complaint appears to concede medical basis for the Complainant not to report to work, but contends he should have received a medical check. Regardless, failure to provide medical care (if accurate) does not represent a claim with an articulated link to the Complainant's Protected Class. Concerns for public safety-related services can be addressed  outside the scope of a complaint for discrimination (such as through an internal grievance, hotline report, or external grievance). In his online report to EOS, the Complainant reported that he had a stroke on the job on February 23, 2021, that he visited his doctor, then went to the emergency room where he was admitted to an Intensive Care Unit. The personnel records establish that the Complainant received leave with pay through March 2021, followed by a leave of absence until March 26, 2021, and additional periods of paid leave. The allegations regarding medical care and check ins are not timely, do not provide sufficient details or facts for a finding to be made under the Policy (that he was sent home from work without basis or that the status checks were negative employment actions), and also do not provide facts which link the alleged conduct to a Protected Class category.

- The comment by Lead Officer C.K. may constitute an offensive joke or otherwise unprofessional comment (such as unjustly inferring or accusing an employee of falsification of leave requests). Assuming true as presented by the complaint, the text message is not appropriate but does not appear to relate to the Complainant's race, sex or age. In order to constitute harassment, conduct must be severe or pervasive under the Policy. The single text comment by Lead Officer C.K. did not affect the approval of subsequent extensive periods of paid leave for the Complainant, and another Lead Officer followed up with the Complainant to connect him with HR processes for medical-related leave. Specifically, Lead Officer Z.S. appears in submitted text images to share general information with the Complainant (letting him know about his leave balances) and then check for his status after at least three days of consecutive leave. Per sick leave protocols, departments may request updates to ensure adequate daily staffing or even a note from a medical provider for more than three days of consecutive leave time. Therefore the comments by Lead Officer Z.S. appear to be informational and within policy to verify sick leave status, and subsequent events favored the Complainant for FML and additional paid leave approvals.[9] In a video submitted by the Complainant, a man matching his description

---

[9] The Complainant went on leave status after February 22, 2021, through his termination date of December 16, 2021. During that time, HR approved Family Medical Leave status and multiple disbursements of pooled sick leave.

*Confidential

holds a cell phone and calls a person he identifies as Lead Officer Z.S. The caller states that he was informed to call Lead Officer Z.S. at least by the 18th of the month to let Lead Officer Z.S. know he was approved to FML and to let Lead Officer Z.S. know what was going on. Lead Officer Z.S. confirms that an unidentified female cc'd him on the documentation. The caller states that he is still getting tests run and wants to return to work, and the person identified as Lead Officer Z.S. states that he "totally understands." The caller states that his doctor is asking until August 21 or 23. The person identified as Lead Officer Z.S. on the call agrees they are on the same page regarding medical leave through August 23. In another call, the same person informs the caller that he needs to contact the female employee in HR to request an extension. He then explains that the FML process is only "securing your job" and discusses input of job hours by HR. He repeats again that the Complainant should contact HR to see if HR needs any other information. Then the caller indicates he is approved for sick pool leave. The person identified as Lead Officer Z.S. notes the letter is dated May 11, and that over 200 hours of sick time were added to his timesheet through May 6. The person identified as Lead Officer Z.S. then appears to read more from the letter, and states he will email the female in HR and encourages the Complainant a third time to also reach out to HR to resolve his questions. The Complainant then requests the phone number in HR for the person issuing letters on his leave, Lead Officer Z.S. replies with the number and encourages him to share what was shared on the call. Therefore the information presented in the complaint supports that Lead Officer Z.S. retrieved an HR notification for the Complainant, read him pertinent sections of information, attempted to explain the difference in sick pay policies and FML status, referred him multiple times to the correct department to resolve any remaining questions, and retrieved the direct contact information for the involved HR personnel. The positive and appropriate response of Lead Officer Z.S. and positive approvals from Human Resources provided the Complainant with a supportive environment to receive medical leave and possibly return to work at the conclusion of leave. The allegations as to Lead Officers Z.S. and C.K. are entirely untimely, do not provide sufficient details or facts for a finding to be made under the Policy (with no negative action by Lead Officer Z.S. identified), and do not provide facts which link the alleged conduct to a Protected Class category.

The complaint also alleges that Lead Officers would get upset when the Complainant **used personal or vacation time**, which the complaint attributes to Chief Moore, Assistant Chief C.J.,

---

Therefore, the official actions of the University supported both his leave status and additional pay beyond his personal accrued leave.

*Confidential

HR Benefits Analyst A.R.,[10] Employee A. (last name unspecified),[11] and Lead Officer J.P. from February 2018 to December 2021 as discrimination based on race, age and sex.

- The complaint does not specify the names of the primary Respondents (the officers who allegedly gave the Complainant a hard time). Without this information, the complaint limits EOS' ability to investigate the claims. The facts in his personnel records document that the Complainant used thirty-seven (37) vacation days during the applicable time frame (not including dates marked as University holidays). Therefore, the complaint does not present sufficient details or facts for a Policy finding nor linking facts to the Complainant's Protected Class status, and specific circumstances (the lack of identified actors) prevents the University from gathering evidence. The one negative comment cited in the record from Lead Officer C.K. is discussed above, and the record is unclear as to any negative actions on the Complainant's employment as the department approved the Complainant's individual leave requests and HR approved his FML and extended sick pool requests. The allegations are untimely except for the last weeks of 2021, do not provide sufficient details or facts for a finding to be made under the Policy (no specific comments or actions identified beyond one singular and untimely filed comment from Lead Officer C.K.), present circumstances that limit the University's ability to investigate and the allegation does not provide facts which link the alleged conduct to a Protected Class category.

The complaint also alleges that Lead Officer L.P., HR Benefits Analyst A.R. and Sergeant B. (unspecified) shared information that the Complainant was not getting any paid time while on FMLA sometime in August 2020 through February 2021 as a form of retaliation. The Complainant supplemented the claim with information that unspecified Respondents told the Complainant "a couple of officers were let go because of being sick."

- EOS notes whether an employee receives pay is a separate determination from eligibility for protected FML status, and it is unclear from the complaint if any comments related to the Complainant's available paid leave balance at the time. The complaint also did not specify who the terminated officers were or whether they may have been unable to return to work after exhausting any options for family medical leave. Additionally, as noted in Lead Officer Z.S.'s updates to the Complainant, the Complainant had limited personal paid leave time remaining in February, and the complaint does not allege that any information related to his leave balance was non-factual (in lieu of any applications for pool leave).

---

[10] An employee near name match (A.R.) served as HR executive administrative assistant, then benefits analyst in December 2019 until their work at UH concluded in September 2022, before the Complainant completed his complaint supplements. The complaint materials note this person's link to the Complainant was to "review benefits only."

[11] The complaint describes Employee A. as "Personal Director." EOS located personnel records for an employee with slightly different first name spelling A.H-P., who served as a Program Manager 1 in the UHPD, however that employee no longer works for UH as of November 2021, prior to the complaint filing date.

*Confidential

Therefore the allegation does not provide sufficient details or facts for a finding under the Policy and the allegation is untimely.

Claims Related to Human Resources and Promotion Opportunity

The complaint alleges that Assistant Chief C.J., Chief Moore, HR Benefits Analyst A.R. and Employee A. (last name unspecified) disqualified the Complainant for a **lead security officer position** by requiring more years of experience to qualify for the position from February 2018 to February 2021, based on his race, age and sex. He also alleges that Assistant Chief C.J. informed him that they were not aware of his "years of employment dates."

- According to the job position for Lead Security Officer, the position requires "a minimum of three (3) years of directly job-related experience." EOS reviewed records of a dozen employees serving or promoted to Lead Security Officer through June 2021. The records included eight black employees, six male employees and six employees over the age of forty. Therefore the personnel records due not suggest a negative hiring or promotion preference against persons in the Complainant's race, gender or age category. Per the offer information in his personnel file, the Complainant appears to have at least three years of related experience for the security officer position at the time of his hire in May 2016. Therefore even for a minimum of three (3) years of directly job-related experience, he appears to qualify to apply for the Lead Security Officer position. Hiring managers become familiar with the qualifications of a candidate during the application process, typically after screening by Human Resources personnel for minimum qualifications. EOS notes the complaint is unclear on how a benefits analyst interacted with the recruitment or screening process. The complaint does not specify whether the Complainant submitted any applications (or whether he alleges HR personnel improperly screened his application as unqualified). The complaint is unclear if hiring managers had any opportunity to consider his application, or how he would be unqualified according to the alleged new minimum job experience requirement. Finally, the entirety of the claim is untimely. Therefore the allegation is untimely, does not present sufficient details or facts for a Policy finding, and does not provide linking facts to the Complainant's Protected Class status.

The complaint also alleges that HR Benefits Analyst A.R., Employee A. (last name unspecified) and Senior HR Recruiter M.J. denied a **request for his personnel file** based on his age, race and sex from February 2018 to February 2021.

- The complaint provides only speculation that Human Resources restricted his personnel file and did so based on any Protected Class category. One Respondent is not identified and another Respondent no longer works for UH as of November 2021 (prior to the filing date of the complaint). The complaint did not present a copy of a written request for the Complainant's personnel records, and the complaint record is unclear on the timing of the request, reason for the request and response to the request. Regardless, the complaint

*Confidential

materials do contain extensive documents from the Complainant's internal personnel files, so it appears that the Complainant did receive the records. The complaint is unclear on any negative impact to the Complainant given the lack of information about reason, timing and nature of the response. The allegation is also not timely per the policy. Therefore the allegation is untimely, does not present sufficient details or facts for a finding under the Policy and does not provide linking facts to the Complainant's Protected Class status.

Finally, the complaint alleges HR Benefits Analyst A.R. and Employee A. (last name unspecified) gave the Complainant a **hard time getting his payment(s)** while on sick leave from February 2021 to December 2021 based on his race, sex and age. Specifically, he stated that they required him to send the same paperwork repeatedly, which caused him additional trips to the UPS store.

- The complaint does not provide a detailed history of communications (verbal or written) regarding the Complainant's application for personal sick leave and/or sick pool. The documentation available in the record reflects multiple approvals by Human Resources of additional sick pool leave. The complaint also does not establish that the Complainant could not have submitted his paperwork via email by attaching images of his supporting documentation. The second Respondent is not identified as discussed above, and the complaint provides only speculation that such requests were based on any Protected Class category. The majority of the timeframe is untimely except November and December 2021. Therefore the complaint does not present sufficient details or facts for a Policy finding nor linking facts to the Complainant's Protected Class status. As summarized above, the Complainant's last disbursement of sick pool leave is dated June 22, 2021, covering paid sick time from June 21, 2021, through August 2, 2021. Hence if his claim relates to sick pool leave applications, it is entirely untimely. Therefore the allegation is mostly untimely (or possibly completely untimely if related to sick pool application), does not present sufficient details or facts for a violation under the Policy and does not provide linking facts to the Complainant's Protected Class status.

Claims Related to General Duties

The complaint alleges Chief Moore, Assistant Chief C.J. and Captain A.B.[12] assigned the Complainant to **work alone on a two-person job** as a form of retaliation, as well as discrimination based on race, age and sex from May 2017 to February 2021. Similarly, the complaint alleges Assistant Chief C.J. and Sergeant J.C. **did not provide him with a golf cart** even though other shifts received access to a golf cart from May 2017 to December 2021, as a form of retaliation and based on his age, race and sex.

- As the Complainant did not report to work the last weeks of 2021, the allegation is untimely. The complaint also does not provide any facts regarding specific comparators

---

[12] Captain A.B. was promoted to Assistant Chief of Police in August 2021.

*Confidential

who worked in shift teams or pairs in similar job assignments, or used golf carts, in order to establish colleagues in substantially similar positions did not work alone or used motorized vehicles. His previous letter to the UH President claimed that he was assigned to work the Cullen Oaks property, where he claimed there were "frat parties with well over a hundred people. I got no assistance." The complaint did not provide any specific dates of instances so EOS could review dispatch logs for requests for additional security support. The complaint also does not specify what particular tasks merited use of any vehicle when the Complainant appears to have a primary assignment location of a single residential area. The Complainant's subjective beliefs that his duties required two persons, conclusory staffing statements without supporting details, and/or vehicle availability do not provide a basis for a finding of discrimination without facts to support that the Complainant was targeted and/or his comparators received different treatment. Further, as EOS operates on-campus and adjacent to multiple residential facilities, campus knowledge supports that security officers often appear on-foot and working solo tasks whether in busy residence halls, student centers or outdoor areas of campus. The allegation is mostly untimely, does not provide sufficient details or facts for a finding under the Policy, and does not provide facts which link the alleged conduct to a Protected Class category.

The Complainant also alleges that a supervisor (Lead Officer L.P.) was "looking for a foolish **reason to write him up**" from February [2018] to December 2021, which he attributed to Assistant Chief C.J. and Chief Moore as the higher levels in the chain of command, as a form of retaliation and discrimination based on his age, sex and race.

- The allegation is untimely given the Complainant did not report to work in late 2021. The allegation does not provide specific facts of any improper verbal reprimand or write up, and therefore, the complaint is speculative and does not present sufficient details or facts for a finding under the Policy nor linking facts to the Complainant's Protected Class status. Furthermore, EOS reviewed five years of Complainant performance evaluation records, which included no matching negative performance note (the listed Respondent was not listed as an author or reviewer for his evaluations). The allegation also includes no specific linking facts to the Complainant's Protected Class status, nor any information as to a preceding protected activity by the Complainant. The allegation is untimely, does not provide sufficient details or facts for a finding under the Policy (both related to any negative action or preceding protected activity), and does not provide facts which link the alleged conduct to a Protected Class category.

The complaint alleges "Lead Officer" R.E.[13] and Assistant Chief C.J. did not provide **proper training for card scans,** and an unidentified Card Programmer told the Complainant he had too

---

[13] While the complaint lists R.E. as "Lead Officer," personnel records list him as a Security Officer until August 2020, when he received a promotion to Police Officer.

*Confidential

many swipes (possible implied question of whether he worked that much or visited too often) as discrimination based on his sex and age from February 2019 to December 2019.

- The complaint does not identify the Respondent who allegedly commented on the Complainant's swipes, nor establish any negative employment action that took place as a result of his alleged lack of training. The allegation is entirely untimely, does not present sufficient details or facts to find a Policy violation nor link the allegation to the Complainant's Protected Class status.

The complaint alleges that Assistant Chief C.J., Lead Officer J.P. and Lead Officer C.K. required security personnel to **wear boots** while other security personnel who were mostly women wore cloth-type shoes, as a form of discrimination based on his race, age, sex and as a form of retaliation from February 2019 to February 2021.

- The allegation is not timely. There are also no linking facts in the complaint related to race, age or prior details of a protected activity under EOS policies. The complaint alleges that during an unspecified meeting, female personnel expressed that they would need a written instruction to change their shoes. The complaint does not identify any comment, statement, practice or policy allowing women in similar positions to not wear boots in the workplace or a policy only requiring men to wear boots. The complaint also does not identify any negative penalty the Complainant received for not wearing boots in the workplace. The allegation is untimely, and it does not provide facts which link the alleged conduct to a protected category for age, race or as a form of retaliation. As to sex or gender, the allegation is untimely and does not provide sufficient details or facts for a finding to be made under the Policy.

The complaint alleges that Chief Moore once accompanied Assistant Chief C.J. and **asked the Complainant what he was doing while on duty and why**, the Complainant replied, and they both **told him** to carry on, which took place and/or affected the Complainant at some time between February 2019 and February 2021, as discrimination based on his race, age, and sex as well as a form of retaliation.

- The allegation does not provide supporting facts for how a supervisor checking on an employee once in passing and affirming that the employee should carry on with their current activity is a negative action. The complaint supplements include a conclusory statement that, "The two top police officers placed [the Complainant] in a hostile environment." The complaint also does not provide facts which link the alleged conduct to the Complainant's age, race or sex. The allegation is also untimely. The allegation is therefore untimely, does not present sufficient details or facts for a finding under the Policy nor link the allegation to the Complainant's Protected Class status.

The Complainant alleges "Lead Officer" R.E. and Lead Officer L.P. **singled out the Complainant for enforcing the no-smoking policy in the dormitories** (after Lead Officer R.E. informed him

*Confidential

not to worry about that policy) during the time period February 2019 to February 2021 as discrimination based on his race and age.

- The complaint does not provide specific facts for how the Respondents allegedly singled out the Complainant, such as specific statements or actions or any related facts (time, location, witnesses, etc.). The complaint does not identify any specific negative employment actions, and EOS located no negative related remarks in his performance evaluations. The matter is also untimely. The allegation is therefore untimely, does not provide sufficient details or facts for a finding under the Policy, and also does not provide facts which link the alleged conduct to a Protected Class category.

The complaint alleges that Assistant Chief C.J., Captain A.B., Lead Officer C.K., Lead Officer J.P. and HR Benefits Analyst A.R. **required the Complainant to explain himself to multiple people** rather than a single manager or supervisor in the timeframe of Fall 2020 to December 2021 as a form of retaliation as well as discrimination based on his race, age and sex.

- The complaint does not provide examples of specific instances in which the Complainant had to explain himself to multiple parties. The complaint also does not provide supporting facts to demonstrate that other officers of different Protected Classes than the Complainant did not have to report information to multiple persons. Given the nature of security work which may require communications from the scene to other officers and staff regarding real-time events, or simply updates to various supervisors based on shift coverage and supervisor rotation, it is also unclear that generally the department would not have legitimate and non-discriminatory bases to expect robust internal communications. The complaint also does not account for tasks related to supervisory oversight, or explain why higher level supervisors should not be able to collect information from all levels of the organization. The allegation is also untimely as the Complainant did not report to work in late 2021. It is also unclear from the complaint how a Benefits Analyst in HR had any role in the internal department expectations for communications from the Complainant. Finally, the allegation also does not identify any specific protected activity preceding the unspecified instances where leadership required such updates. Therefore the allegation is untimely, does not provide sufficient details or facts for a finding under the Policy, and also does not provide facts which link the alleged conduct to a Protected Class category or prior protected activity.

The complaint alleges Assistant Chief C.J., Sergeant J.C., Lead Officer Z.S., Lead Officer J.P., Lead Officer C.K., and Employee A. (last name unspecified) failed to take steps to prevent the Complainant from **entering a security kiosk area where the previous officer in the area exhibited factors of Covid-19 infection**. The complaint alleges the incident as a form of retaliation as well as discrimination based on race, age and sex.

*Confidential

- The Complainant described in his letter to the President that he arrived to work on his birthday (December 13, 2020) and the "Leads spoke to me [and] wished me a Happy birthday. But they did not tell me to stay out of the Security Kiosk, because it had to be Covid Cleaned [and] Sanitized. The Complainant alleges that Lead Officer Z.S. asked him whether anyone had told him about possible Covid exposure when Lead Officer Z.S. found him in the area halfway through the Complainant's work shift. The complaint does not identify a specific protected activity by the Complainant under EOS policies prior to the incident. The complaint does not provide linking facts to the Complainant's Protected Class status. While his complaint supplement lists the incident as occurring between February 2020 and December 2021, his letter to the President is specific as to the event date in 2020 and the Complainant did not report to work in late 2021. Therefore the allegation is not timely, does not provide sufficient details or facts for a finding under the Policy, and also does not provide facts which link the alleged conduct to a Protected Class category or protected activity.

Claims Related to Termination Process

The complaint alleges Lead Officer Z.S. and Lead Officer L.P. **harassed the Complainant for not providing an update while he was in the hospital** in the timeframe of August 2020 to February 2021 based on his race, age and sex.

- As discussed above for claims related to the Complainant's leave status, the evidence submitted in the complaint demonstrates efforts by Lead Officer Z.S. to share general information with the Complainant (letting him know about his leave balances) and then checking in for his status as applicable during sick leave. As to timing, the complaint does not establish that such persons were aware that the Complainant went from his doctor's appointment to be hospitalized. As discussed above, the complaint provided a copy of a message from Lead Officer C.K.. While its contents appear inappropriate (implying or joking that the Complainant was using medical reasons to get extra vacation time), the text message does not appear to relate to the Complainant's race, sex or age and that allegation was untimely as discussed above. The complaint does not allege that any employee denied the Complainant appropriate sick, FML, pool or unpaid leave. In fact, the complaint alleges the department asked the Complainant to go home for four days around the time of this incident, as discussed above. Therefore the allegation does not provide specific facts or details for a finding of harassment under the Policy, and also does not provide facts which link the alleged conduct to a Protected Class category. The claim is also untimely.

The complaint alleges Sergeant B. (no employee match) harassed the Complainant by pressuring him to resign or else be terminated during FML status during the timeframe of August 2020 to February 2021. The complaint describes a few weeks later the Complainant presented a resignation letter to Lead Officer Z.S. The complaint alleges Lead Officer Z.S. informed him Sergeant B. did not tell him correctly "there was a statement on letters under the conditions of him having to resign

*Confidential

or be terminated." The complaint alleges the activities as a form of retaliation as well as discrimination based on his age, race and sex. The complaint alleges that Assistant Chief C.J. told an unnamed male employee to hold off on the resignation. The complaint also alleges that the Complainant received a **bigger paycheck than the lead officers due to his overtime**, so Lead Officer Z.S. participated in this alleged harassment as a form of retaliation. Complaint materials also list HR Benefits Analyst A.R. and Employee A. as Respondents.

- If true as to paycheck concerns, negative communications or conduct based on approved pay levels and scheduling are a concern for professionalism that can be addressed through department management and/or Human Resources. Even assuming as true the conclusory accusation that Lead Officer Z.S. resented his pay level based on overtime, that claim does not present linking facts to a Protected Class or establish a protected activity for a potential retaliation claim under EOS policies. EOS also notes the complaint records actually reflect professional and appropriate communications by Lead Officer Z.S. The claim against Lead Officer Z.S. is untimely and as described above, lacks sufficient facts to support a finding of a violation under the Policy, as well as linking facts to a Protected Class basis or protected activity.

- Importantly, any possible suggestion or conduct encouraging him to resign was not effective, and the Complainant's effective termination date was December 16, 2021. Assuming the allegation is true that a person with partial name B. at the rank of Sergeant improperly or mistakenly encouraged the Complainant to submit a resignation letter, the record supports that Lead Officer Z.S. took steps to connect the Complainant to HR leave processes and HR did approve and implement FML and additional paid leave for the Complainant. If, as alleged in the complaint, higher-level leadership intervened to prevent a supervisor from proceeding with an early resignation, it is unclear how that constitutes a negative action by such leader(s) against the Complainant. The allegation therefore does not provide sufficient details or facts for a finding to be made under the Policy (including no negative or specific actions identified for the listed Respondents), and the allegation does not provide facts which link the alleged conduct to a Protected Class category. Finally, the allegation was also not timely filed.

The complaint also alleges that Assistant Chief C.J. commented that the department had to **get rid of the Complainant's termination letter** around the time of Lead Officer C.K.'s comments, taking place around February to March 2021, as a form of discrimination based on the Complainant's race, age and sex, as well as a form of retaliation. The Complainant described the events generally as pressure to resign. EOS also considered the original claim in the Complainant's communication to the President that he experienced forced resignation.

- Per UH System Family and Medical Leave Policy (SAM 02.02.01), "The Family and Medical Leave Act of 1993, as amended, (FMLA) allows 'eligible employees' to take job-protected, leave for up to a total of 12 workweeks in a 'year,'" which is defined in the

*Confidential

policy as the twelve month period once leave begins. Also per the Policy, "The employee must report to his/her supervisor if he/she will be unable to return to work at the end of the leave period." The department then has discretion whether to approve leave without pay if the employee is not able to return to work. Once the employee gives notice of a return to work per the Policy, "Failure to report by the date intended to return to work will be considered abandonment by the employee of his/her job. Termination of employment due to job abandonment may not be appealed." According to personnel records, The Complainant began leave with pay status on February 23, 2021. After exhausting his own paid leave, he was granted sick pool leave as discussed herein and his employment was not terminated until December 2021, beyond the period of twelve weeks for Family Medical Leave. The complaint supports that Assistant Chief C.J. took steps not to implement any earlier resignation, and his eventual voluntary termination lacks linking facts to his Protected Class status or prior protected activity. If the Complainant attempted to resign in early 2021, or experienced any objective pressure from Lead Officer C.K. to resign, the complaint supports that the department remediated the matter effectively. An allegation based on conduct in early 2021 is also untimely. The alleged negative action by department leadership is unclear and the complaint does not provide sufficient details or facts for a finding to be made under the Policy. The allegation is untimely, the complaint record supports that the department provided an appropriate resolution by not effectuating an early 2021 resignation, there are not sufficient details or facts for a finding to be made under the Policy (including no negative actions attributed to the Assistant Chief), and the complaint does not provide facts which link the alleged conduct to a Protected Class category or prior protected activity.

## CONCLUSION

Based on the information as summarized above, EOS will have to proceed with a full dismissal of the formal complaint at this time. Much of the information presented in the complaint was not filed in a timely manner, and EOS conducted extensive records reviews which did not support a pattern of discrimination in time supervision by the department over security officers. For the specific independent reason(s) for dismissal of each claim, please see the respective summary section above. Please contact EOS for any questions in this matter.

*Confidential

**APPENDIX A**

Appendix A provides a cumulative summary of the Complainant's claims based on information provided through his attorney in a chart of the allegations. EOS attempted to identify potential Respondents based on the information presented in Complainant materials, which included instances of partial names and incorrect job titles.

| Respondent(s) | Claim(s) | Timeframe | Protected Class(es) |
|---|---|---|---|
| *Claims related to fire watch duties* | | | |
| Sergeant J.C., Lead Officer J.P. and Lead Officer C.K. | Information not relayed to Mr. Gaskin most of the time | March 2017 – Feb. 2021 | Race and Age |
| *Claims related to Overtime* | | | |
| Sergeant J.C.[14] | Changed overtime system after report about Lead Officer J.P. | Aug. 2017 – Dec. 2021 | Retaliation, Race, Age and Sex |
| Lead Officer J.P.[15] or Lead Officer (unspecified) | Gave overtime to a female security officers but reduced his overtime | Feb. 2018 – Dec. 2021 | Race, Gender, Sex and Age |
| Lead Officer J.P. | Told Mr. Gaskin he was being too greedy with overtime | Feb. 2018 – Dec. 2021 | Race, Age and Sex |
| Lead Officer C.K., Sergeant J.C. and Asst. Chief C.J. | Still had double shifts on Friday and Saturday for overtime after change in system | May 2018 – Feb. 2023[16] | Race, Age and Sex |
| *Claims related to leave* | | | |
| Lead Officer J.P. | Handled scheduling and would give women the weekends off | Feb. 2018 – Dec. 2021 | Race, Age and Sex |
| Lead Officer C.K. | Emailed Mr. Gaskin after his medical event implying that he used the event for vacation days | Feb. 2018 – Dec. 2021 | Retaliation |
| Employee A. (last name unspecified), Chief Moore, Sergeant J.C., Lead Officer J.P., | Leads got upset when Mr. Gaskin used his vacation and sick days | Feb. 2018 – Dec. 2021 | Race, Age and Sex |

---

[14] The Complainant listed "Lieutenant C." in his complaint materials but personnel records include Sergeant J.C.

[15] The Complainant's materials listed first name "J." or "J.P." While EOS located no personnel records under that last name, the Complainant's professional evaluation was completed in 2016 by Lead Officer J.P. That name is used in the summary report.

[16] While the Complainant provided this timeframe, it is not possible due to his resignation in December 2021.

*Confidential

| | | | |
|---|---|---|---|
| HR Benefits Analyst A.R. | | | |
| Lead Officer Z.S., Sergeant B. (unspecified), HR Benefits Analyst A.R. and other employee B.2. (rank and full name unspecified) | Sent Mr. Gaskin home for four days with no reason given and without calling paramedic per policy | Jan. 2021 – Feb. 2021 | Race, Age and Sex |
| Lead Officer Z.S. and Lead Officer L.P. | Told Mr. Gaskin that Lead Officer L.P. said Mr. Gaskin would call as soon as he left his doctor's office | Aug. 2020 – Feb. 2021 | Race, Age and Sex |
| Lead Officer Z.S. and Lead Officer L.P. | Harassed Mr. Gaskin for not calling in with an update when he was in the hospital | Aug. 2020 – Feb. 2021 | Race, Age and Sex |
| Lead Officer L.P., HR Benefits Analyst A.R. and Sergeant B. (unspecified) | Informed ["them"?] Mr. Gaskin was not getting any paid time while on FMLA | Aug. 2020 – Feb. 2021 | Retaliation |
| *Claims related to Human Resources and promotion* | | | |
| Chief Moore, Asst. Chief C.J., Employee A. (last name unspecified), and HR Benefits Analyst A.R. | Disqualified for lead officer by requiring more years experience. | Feb. 2018 – Feb. 2021 | Race, Age and Sex |
| Senior HR Recruiter M.J., HR Benefits Analyst A.R., and Employee A. (last name unspecified). | Denied his request for personnel file | Feb. 2018 – Feb. 2021 | Race, Age and Sex |
| HR Benefits Analyst A.R. and Employee A. (last name unspecified). | Gave him a hard time to get payments while out sick (repeat trips to UPS store to send the same paperwork) | Feb. 2019 – Dec. 2019 | Race, Age and Sex |

*Confidential

| Claims related to general duties | | | |
|---|---|---|---|
| Asst. Chief C.J., Chief Moore and Captain A.B. | Worked alone on a two-man job | May 2017 – Feb. 2021 | Retaliation, Race, Age and Sex |
| Asst. Chief C.J. and Sergeant J.C. | Not provided golf cart when other two shifts had vehicles. | May 2017 – Dec. 2021 | Retaliation, Race, Age and Sex |
| Chief Moore, Lead Officer L.P., and Asst. Chief C.J. | Supervisor was looking for a foolish reason to write him up | Feb. 2028 (sic) – Dec. 2021 | Retaliation, Race, Age and Sex |
| Officer R.E.[17] and Asst. Chief C.J. | No proper training for card scans and Card Programmer said Mr. Gaskin had too many card swipes (questioning if did that much work) | Feb. 2019 – Dec. 2019 | Sex and Age |
| Asst. Chief C.J., Chief Moore, Lead Officer J.P. and Lead Officer C.K. | Required to wear boots while others wore sneakers (mostly women wearing cloth shoes) | Feb. 2019 – Feb. 2021 | Retaliation, Race, Age and Sex |
| Asst. Chief C.J. and Chief Moore | Asked what Mr. Gaskin was doing (while on job duty) and why. Mr. Gaskin explained and they both told him to carry on | Feb. 2019 – Feb. 2021 | Retaliation, Race, Age and Sex |
| Sec. Officer R.E. and Lead Officer L.P. | Caused Mr. Gaskin to be singled out for enforcing the no smoking policy because R.E. said not to worry about that policy | Feb. 2019 – Feb. 2021 | Race and Age |
| Asst. Chief C.J., Captain A.B., Lead Officer J.P., Lead Officer C.K. and HR Benefits Analyst A.R. | Mr. Gaskin would have to explain himself to a lot of people rather than one supervisor/manager explaining matters to the others in the chain of command. | Fall 2020 – Dec. 2021 | Retaliation, Race, Age and Sex |
| Asst. Chief C.J., Lead Officer Z.S., Sergeant J.C., Lead Officer J.P., Lead Officer C.K., Employee A. (last name unspecified). | Mr. Gaskin was exposed to Covid-19 when he entered the security kiosk area after the previous officer in the area had Covid and no one told him. Lead Officer Z.S. asked Mr. Gaskin what he was doing there and said, "didn't anyone tell you about Covid in this office?". Mr. Gaskin | December 13, 2020 or 2021 (Complainant's birthday) | Retaliation, Race, Age and Sex |

---

[17] Per personnel records, R.E. promoted to Police Officer in August 2020.

*Confidential

| | was not informed until his shift was halfway over. | | |
|---|---|---|---|
| | *Claims related to termination process* | | |
| Lead Officer Z.S., Lead Officer L.P. and Sergeant B. (unspecified) | Received Mr. Gaskin's resignation letter and said Sergeant B. did not tell Lead Officer Z.S. there was a statement on letters under the conditions of him having to resign or be terminated | Aug. 2020 – Feb. 2021 | Retaliation, Race, Age and Sex |
| Sergeant B., Lead Officer Z.S., Lead Officer L.P., HR Benefits Analyst A.R. and Employee A. (last name unspecified) | Harassed Mr. Gaskin that he would have to resign, or they would terminate him while out on FMLA | Aug. 2020 – Feb. 2021 | Retaliation, Race, Age and Sex |
| Asst. Chief C.J., Chief Moore and Lead Officer C.K. | Said they had to get rid of Mr. Gaskin's termination letter as well as pressure to resign | Feb. 2021 – March 2021 (around time of comments by Lead Officer C.K.) | Retaliation, Race, Age and Sex |